# In the United States Court of Federal Claims

BID PROTEST
No. 11-734 C
(Filed Under Seal: May 23, 2012)
(Reissued for Publication: June 5, 2012)[*]
TO BE PUBLISHED

|  |  |
|---|---|
| WILDFLOWER INTERNATIONAL, LTD., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> GOVPLACE, INC., <br><br> Defendant-Intervenor. | ) <br> ) Federal Acquisition Streamlining Act, Pub. L. No. <br> ) 103-355, 108 Stat. 3243 (1994); limitation on <br> ) protests of civilian agency task or delivery orders; <br> ) 41 U.S.C. § 4106(f); expiration of limitation; <br> ) National Defense Authorization Act for Fiscal Year <br> ) 2008, Pub. L. No. 110-181, 122 Stat. 239; <br> ) interpretation of sunset provision in 2008 NDAA in <br> ) light of later enactments; restoration of limitation on <br> ) protests of task or delivery orders after plaintiff filed <br> ) bid protest action; National Defense Authorization <br> ) Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 <br> ) Stat. 1298 (2011); retroactivity analysis; restoration <br> ) of limitation did not affect plaintiff's pending action; <br> ) presumption against retroactivity; *Landgraf v. USI* <br> ) *Film Products*, 511 U.S. 244 (1994); *Princess* <br> ) *Cruises, Inc. v. United States*, 397 F.3d 1358 (Fed. <br> ) Cir. 2005); court has jurisdiction to hear protests of <br> ) corrective action taken during procurement; prior <br> ) awardee has standing to protest corrective action; <br> ) protest of corrective action ripe for judicial review; <br> ) decision to take corrective action was reasonable; <br> ) nature and scope of corrective action was reasonable <br> ) under circumstances; clarification of ambiguity in <br> ) initial solicitation. <br> ) |

Lars E. Anderson, Venable LLP, Vienna, Va., for plaintiff.  James Y. Boland, Venable LLP, Vienna, Va., of counsel.

---

[*] This Opinion and Order was originally filed under seal on May 23, 2012 (docket entry 69) pursuant to the protective order entered on November 9, 2011 (docket entry 15).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a joint status report on June 4, 2012 (docket entry 71).  The United States and Govplace joined in requesting redaction of pricing information submitted prior to award by non-awardees.  Wildflower has taken the position that no redactions should be made.  The Court has reviewed the redactions proposed by the United States and Govplace and concluded that they are appropriate. Accordingly, the Court is reissuing its Opinion and Order dated May 23, 2012 with redactions indicated by three consecutive asterisks within brackets ([***]).

Kenneth S. Kessler, Trial Attorney, Donald E. Kinner, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant.

Jonathan S. Aronie, Sheppard, Mullin, Richter & Hampton LLP, Washington, D.C., for defendant-intervenor.  Anne B. Perry, Marko W. Kipa, Sheppard, Mullin, Richter & Hampton LLP, Washington D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

Plaintiff, Wildflower International, Ltd. ("Wildflower"), filed this pre-award bid protest action against defendant, the United States, on November 3, 2011.  *See* Compl. (docket entry 1). Wildflower challenges the Department of Homeland Security ("DHS"), Customs and Border Protection's ("CBP") decision to terminate Wildflower's delivery order for convenience and to repost a revised Request for Quotes ("RFQ") as part of CBP's "corrective action" with respect to perceived problems with the conduct of the initial procurement pursuant to the initial RFQ.  For the following reasons, defendant's motion to dismiss based on lack of jurisdiction, standing, and ripeness is **DENIED**; defendant-intervenor Govplace Inc.'s ("Govplace") motion to dismiss based on lack of jurisdiction is **DENIED**; Wildflower's motion for judgment on the administrative record is **DENIED**; and defendant's and Govplace's motions for judgment on the administrative record are **GRANTED** (docket entry 33, Dec. 6, 2011; docket entry 34, Dec. 6, 2011; docket entry 38, Dec. 9, 2011; docket entry 53, Feb. 7, 2012; docket entry 54, Feb. 7, 2012).

## I.      Background

The procurement at issue deals with the delivery, installation, and support of Local Area Network ("LAN") switches and related equipment for numerous CBP facilities under DHS's FirstSource contract, a multiple-award, indefinite-delivery/indefinite-quantity contract.  *See* Administrative R. ("AR") Tab A, at 4; AR Tab B, at 56, 258; AR Tab E, at 649.  Wildflower and Govplace are prime contractors under the FirstSource contract.  *See* AR Tab F, at 726–27.  The purpose of the FirstSource contract is to provide DHS with the ability to purchase information technology "commodity products (hardware and software) and associated services."  AR Tab E, at 649.

CBP used a "reverse auction" on a website called FedBid to fill the delivery order at issue.  *See* AR Tab B, at 56.  The FirstSource Ordering Guide describes FedBid as "[a]n online reverse auctioning tool where buyers can procure commodity-type commercial items and satisfy competition, publicizing, and reporting requirements."  AR Tab F, at 747.  A vendor cannot view the price or name of other vendors during the bidding period, but knows whether its price "leads" or "lags."  Def.'s Mot. to Dismiss, or in Alternative, for J. upon Administrative R. ("Def.'s Mot.") 6–7 (internal quotation marks omitted).  A vendor can reduce its bid and underbid another vendor until the bidding period closes.  *Id.*  FedBid allows vendors to ask questions directly to the contracting officer during the bidding period and allows the contracting officer to respond directly to the vendor that submitted the question.  AR Tab B, at 56.  "Vendors can only view

other vendor's questions and answers if these questions and answers are posted as an attachment to the RFQ." AR Tab B, at 56–57; *see also* AR Tab B, at 69, 73.

> A.     *Initial RFQ and Award to Wildflower*

The initial RFQ—RFQ 20064082—was posted on FedBid on August 24, 2011, with the bidding period ending on August 31, 2011, which was later extended to September 6, 2011. AR Tab B, at 66–70, 219, 508.

The RFQ indicated that the delivery order would be awarded to the offeror whose past performance did not pose a risk and whose offer was the lowest priced and technically acceptable. AR Tab B, at 69. Technical acceptability meant the "technical capabilities conform to the Government's Statement of Work or listed specs whichever is applicable to the buy." *Id.* Delivery was required approximately eighteen months from the time of award. *Id.* The RFQ called for "[b]rand [n]ame [Cisco] or [e]qual" equipment. AR Tab B, at 68. Vendors were instructed that they could "submit bids for alternate items, provided those items [met] all of the salient physical, functional, or performance characteristics specified by this solicitation." *Id.* The FirstSource contract requires hardware and software "that are factory-installed and ready for immediate use," unless otherwise provided in the delivery order. AR Tab E, at 658.

The Statement of Work ("SOW") required some of the equipment to have "functionality" with, *inter alia*, the so-called "802.1ae" standard. *See* AR Tab B, at 110. According to defendant, 802.1ae is a standard developed by the Institute of Electrical and Electronic Engineers that specifies protocols to meet security requirements. At issue in this action is whether the solicitation was ambiguous as to whether an offeror was required to be technically compliant with 802.1ae at the time of award or at some later time during the eighteen-month performance period.

By the end of the bidding period, on September 6, 2011, four bids had been submitted by FirstSource contractors. AR Tab B, at 66. Wildflower submitted the lowest bid at approximately $5.1 million, and Govplace submitted the highest bid at approximately [***]. *Id.*

The technical evaluator at first found Wildflower's offer to be technically unacceptable because, *inter alia*, he believed that the initial SOW required the awardee's equipment to be technically compliant *at the time of award*, and three of Wildflower's proposed switches would not become technically compliant until the last quarter of 2012. *See* AR Tab B, at 180, 548. CBP told Wildflower that some of Wildflower's "devices do not meet the requirement to support 802.1AE. While the support is enabled in hardware, the software required to support this requirement will not be available till 4th quarter 2012." *Id.*

In response, Wildflower pointed to a question-and-answer exchange in which CBP had suggested that an offeror could propose equipment that would meet CBP's technical requirements by the end of the eighteen-month performance period. *See* AR Tab B, at 189, 550; *see also* AR Tab B, at 147, 150. Wildflower's question stated:

> 802.1AE is an open standard that is not widely enabled in the industry. While most hardware will support 802.1AE when there is further software development

and released in the next year [sic].  By requiring that this specification be enabled at the time of contract award, the Government is effectively limiting competition to CISCO and creating a sole source procurement.

AR Tab B, at 150.  In its answer, CBP identified Juniper as a producer of non-Cisco equipment that "has this capability and will be released in its next scheduled software release."  AR Tab B, at 546.  In its response to CBP's letter identifying technical issues, Wildflower wrote: "Based on the government response, Wildflower bid a solution that is compliant.  Please note that the government specifically called out Juniper products with future releases as being acceptable.  In reliance upon the government representation Wildflower bid the Juniper product."[1]  AR Tab B, at 189.  The parties dispute whether this question-and-answer exchange was shared with other offerors.  *See infra* Part IV.A.

Wildflower also pointed to a public question and answer in which a bidder had asked if CBP expected an "equal amount of work" performed each month over the eighteen-month period.  CBP responded: "The Offeror has the responsibility and flexibility to design the schedule in the most cost effective manner it can so long as it is executed in the time allocated.  The creation of the schedule is the Offeror's responsibility."  AR Tab B, at 189; *see* AR Tab B, at 135.

After reviewing Wildflower's response, the technical evaluator indicated that CBP could accept Wildflower's bid if Wildflower "were to be contractually liable to retrofit the installation of th[e] equipment within the contract award time at no cost to the Government."  AR Tab B, at 204.  CBP asked Wildflower, "Are you agreeing to start installation upon time of award and then retrofit the installed equipment at no cost to the Government when the 802.1ae software capability is available in 4th quarter of 2012?"  AR Tab B, at 215, 555.  Wildflower responded in the affirmative.  *Id.*

In light of the foregoing exchange, the technical evaluator found Wildflower's offer technically acceptable and, on September 17, 2011, Wildflower was awarded the delivery order.  *See* AR Tab B, at 214, 219, 223.  The e-mail exchange between CBP and Wildflower reflecting Wildflower's agreement to retrofit compliant equipment at no cost to the Government was attached to the delivery order.  *See* AR Tab B, at 286.  Wildflower's price was disclosed to the other offerors through FedBid sometime between September 17, 2011, when Wildflower was awarded the delivery order, AR Tab B, at 58, 223, and September 19, 2011, when Govplace submitted a letter to CBP expressing concern over a "possible error" in the procurement process.  AR Tab B, at 371–73; *see* AR Tab B, at 58, 588.

---

[1] Wildflower notes that it was not the only bidder to propose non-Cisco equipment and that two offerors, who are not involved in this case, also included non-Cisco equipment in their quotes.  Pl.'s Mot. for J. on Administrative R. & Req. for Permanent Inj. Relief ("Pl.'s Mot.") 4 n.1, 8.

> B.  *Termination for Convenience of Wildflower's Delivery Order and Resolicitation with Revised SOW*

On September 19, 2011, Govplace sent a letter to the ombudsman for the FirstSource contract, *see* AR Tab D, at 646 (naming the ombudsman for CBP's task and delivery orders); AR Tab E, at 677, 732, which pointed out a "possible error" in the technical evaluation.  AR Tab B, at 372.  Govplace stated that "[i]t appears that the government is accepting a technical solution that does not conform to a material government need."  *Id.*  Govplace stated that at the time of the procurement only Cisco equipment, which Govplace had proposed, could satisfy the 802.1ae requirement.  Govplace apparently believed that technical compliance was required at the time of award.

Following two meetings attended by the ombudsman, the contracting officer, the contracting specialist, and the technical evaluator on September 20, 2011 (the day after Govplace's September 19, 2011 letter), the contracting officer decided to terminate Wildflower's delivery order for convenience and reissue the RFQ with a revised SOW.  The contracting officer's rationale for taking such action was that the initial solicitation was ambiguous with respect to whether an awardee's equipment was required to be 802.1ae compliant *at the time of award* or could come into compliance during the eighteen-month performance period.  In a September 23, 2011 memorandum for the record, the contracting officer stated:

> The facts of the solicitation and technical evaluation was [sic] discussed [at the two meetings] and the conclusion that resulted was that the solicitation was not clear on when an offeror had to be fully 802.1ae compliant and this change was significant enough to Terminate for the Convenience of the Government the Wildflower International award, . . . change the Statement of Work to clarify when full compliance of 802.1ae function was required and resolicit this requirement with the revised Statement of Work.

AR Tab B, at 395.  The administrative record also contains e-mails preceding the contracting officer's decision to take what defendant refers to as "corrective action" in which CBP and DHS personnel discussed such matters as the specific language to include in the revised SOW to clarify the ambiguity, the revised publicly posted questions and answers, and the delivery schedule that would result from the changes to the RFQ.  *See* AR Tab B, at 389–90, 397, 400–01, 406–07, 416–17, 450.1–.3, 453–55, 457–64, 466, 468–71, 473–74, 476–77, 479–81, 483–84.

On the afternoon of September 20, 2011, Wildflower was informed of the termination of its delivery order by phone and in a letter attached to an e-mail.  *See* AR Tab G, at 773.  On September 21, 2011, CBP e-mailed Wildflower a letter with instructions on how to request termination costs.[2]  AR Tab H, at 774.  Pursuant to amendment number P00001, Wildflower's

---

[2] The letter attached to the September 21 e-mail is dated *September 22* and states that the contract was terminated *September 21, "yesterday."*  Other than this letter, the administrative record indicates that the contract was terminated on September 20, and Wildflower was provided with instructions for requesting termination costs on September 21.  *See* AR Tab G, at 772–73; Tab H, at 774–75.

delivery order was formally amended to terminate the order for the convenience of the Government on September 23, 2012.[3]  AR Tab B, at 369; *see* AR Tab B, at 395.

On September 21, 2011, CBP issued the second RFQ—RFQ 2006687—with a revised SOW.  AR Tab A, at 4; AR Tab B, at 59–60, 596.  The revised SOW differed from the initial SOW in the following respects.  First, the revised SOW expressly provided that CBP would "deem a solution technically compliant if the 802.1ae functionality [was] fully operational (in software) by 2 January, 2013."  AR Tab A, at 10 (emphasis omitted).  An offeror proposing a solution that was not technically compliant at the time of the award was required to provide documentation demonstrating that it would be compliant by January 2, 2013.  Second, the SOW's description of the equipment requiring 802.1ae functionality was updated to explain that functionality was required to be achieved by January 2013.  *See* AR Tab A, at 11–14.  Third, the awardee was required to provide, within forty-five days, a plan for replacing the switches and related equipment and to begin executing that plan within ninety days from the date of contract award.  *See* AR Tab A, at 5.  The questions and answers attached to the revised SOW referenced the provision that explained that 802.1ae functionality could be achieved by January 2013.  *See* AR Tab B, at 634–35.

The bidding period for the revised RFQ was approximately twenty-four hours.  *See* AR Tab B, at 59–60.  The same four offerors submitted bids in response to the second RFQ.  Govplace proposed the lowest price, approximately [***], a significant reduction from its initial price of approximately [***].  AR Tab B, at 66; AR Tab J, at 781.  Wildflower submitted the third lowest bid at [***], AR Tab J, at 781, [***] as its original bid of $5,076,806.91.  AR Tab B, at 66.  Govplace proposed Cisco equipment and does not appear to have changed its technical proposal in response to the resolicitation.  *See* AR Tab J, at 809.

On September 22, 2011, before bidding closed, Wildflower filed a protest with the Government Accountability Office ("GAO").  *See* AR Tab B, at 488.  In the GAO protest, Wildflower alleged that (1) CBP's termination of Wildflower's delivery order was arbitrary and unreasonable; (2) CBP's decision to resolicit the LAN equipment requirement was unreasonable and unfair; (3) CBP resolicited the RFQ in order to award the delivery order to CBP's preferred vendor, which was unreasonable, an abuse of discretion, and contrary to law; and (4) Cisco should be excluded from the competition due to conflicts of interests.  Wildflower withdrew its GAO protest on November 3, 2011 before responding to CBP's agency report.  AR Tab C, at 644.

Also on November 3, 2011, Wildflower initiated this action, challenging the termination for convenience of its delivery order and the reissuance of the RFQ with a revised SOW.  Defendant has moved to dismiss based on lack of jurisdiction, standing, and ripeness pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").  Govplace has filed a motion to dismiss based on lack of jurisdiction pursuant to RCFC 12(b)(1).  Wildflower has filed

---

[3] In late October and early November 2011, Wildflower and the contracting officer exchanged letters regarding the approximately $270,000 in termination costs Wildflower requested.  CBP has not yet paid any termination costs to Wildflower.  Wildflower has also not received a final decision from the contracting officer.  *See* Def.'s Mot. Attachs.

a motion for judgment on the administrative record pursuant to RCFC 52.1.  Both defendant and Govplace filed motions for judgment on the administrative record pursuant to RCFC 52.1.  The Court heard oral arguments on January 27, 2012 and March 14, 2012.  *See* Hr'g, *Wildflower Int'l, Ltd. v. United States*, No. 11-734 (Fed. Cl. Jan. 27, 2012) (hereinafter "Jan. 27, 2012 Hr'g"); Hr'g, *Wildflower Int'l, Ltd. v. United States*, No. 11-734 (Fed. Cl. Mar. 14, 2012) (hereinafter "Mar. 14, 2012 Hr'g").  The March 14, 2012 oral argument was principally devoted to the issue whether this court has subject matter jurisdiction over plaintiff's action.

## II.     Subject Matter Jurisdiction

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9–10 (1983)).  When considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court assumes the truth of all undisputed facts as alleged in the complaint and draws all reasonable inferences in the non-movant's favor.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006).

"[O]nce the . . . court's subject matter jurisdiction [is] put in question it [is] incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction."  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  *George Family Trust ex rel. George v. United States*, 91 Fed. Cl. 177, 189 (2009) (quoting *Reynolds*, 846 F.2d at 748) (internal quotation marks omitted).

   A.     *The Federal Acquisition Streamlining Act's Limitation on Protests of Civilian Agency Task or Delivery Orders Did Not Bar Wildflower's Action When It Was Filed in November 2011 Because the Limitation Expired on May 27, 2011*

In 1994, Congress passed the Federal Acquisition Streamlining Act ("FASA"), Pub. L. No. 103-355, 108 Stat. 3243.  FASA contained a provision stating that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued."  FASA, § 1054, 108 Stat. at 3264 (codified as amended at 41 U.S.C. § 4106(f)).  That provision pertained to the issuance or proposed issuance of task or delivery orders by civilian agencies.  FASA also contained a provision limiting protests of defense agency task or delivery orders.  *See* FASA, § 1004, 108 Stat. at 3253 (codified as amended at 10 U.S.C. § 2304c(e)).

Initially, it was not entirely clear whether FASA's limitation applied to civil actions in this court.  *See A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 133 (2006); *Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99, 105 (2001).  Since that time, the courts have interpreted FASA's limitation, which refers to "a protest," as applying to actions in the Court of Federal Claims.  *See, e.g.*, *A & D Fire Prot., Inc.*, 72 Fed. Cl. at 133 ("This court cannot frustrate the intent of Congress . . . .  In the place of agency protests, [GAO] protests or judicial review,

7

Congress saw fit to offer disappointed task order bidders recourse to the agency's task and delivery order ombudsman.").

The Court of Federal Claims has held that FASA's limitation on protests of task or delivery orders is jurisdictional. *See, e.g.*, *Solute Consulting v. United States*, No. 12-37C, 2012 WL 826721, at *11 (Fed. Cl. Mar. 13, 2012); *Furniture by Thurston v. United States*, No. 11-663, 2012 WL 591622, at *4 n.8 (Fed. Cl. Feb. 21, 2012); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 541 (2011); *MED Trends, Inc. v. United States*, 102 Fed. Cl. 1, 4–5 (2011); *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 762 (2010); *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 409 (2009), *modified on other grounds by* 88 Fed. Cl. 466 (2009); *A & D Fire Prot., Inc.*, 72 Fed. Cl. at 133 n.7.

In 2008, as part of the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Congress authorized protests of civilian agency task or delivery orders valued in excess of $10 million and gave GAO exclusive jurisdiction to hear such protests. Pub. L. No. 110-181, § 843(b)(2)(C), 122 Stat. 3, 239 (codified as amended at 41 U.S.C. § 4106(f)). Congress also added a three-year sunset date. The provision in the 2008 NDAA governing protests of civilian agency task or delivery orders read as follows:

> (e) PROTESTS.—(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
>> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>> (B) a protest of an order valued in excess of $10,000,000.
> (2) Notwithstanding section 3556 of title 31, United States Code, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).
> (3) This subsection shall be in effect for three years, beginning on the date that is 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2008.

*Id.* The 2008 NDAA was enacted on January 28, 2008. Accordingly, paragraph (3) provided that "this subsection" would expire on May 27, 2011. The 2008 NDAA made similar amendments to the provision limiting protests of *defense* agency task or delivery orders. *See* 2008 NDAA, § 843(a)(2)(C), 122 Stat. at 237 (codified as amended at 10 U.S.C. § 2304c(e)).

In January 2011, before the sunset date, Congress extended the sunset date with respect to the FASA provision limiting the protests of *defense* agency task or delivery orders. *See* Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("2011 NDAA"), Pub. L. No. 111-383, § 825, 124 Stat. 4137, 4270 (codified as amended at 10 U.S.C. § 2304c(e)). The amended sunset provision identified the paragraphs to which it applied: "(3) *Paragraph (1)(B) and paragraph (2)* of this subsection shall not be in effect after September 30, 2016." *Id.* (emphasis added).

May 27, 2011 came and went without an extension of the sunset date with respect to the provision limiting protests of *civilian* agency task or delivery orders. This raised the question

whether paragraph (3) of 41 U.S.C. § 4106(f), which provided that "this subsection" would expire, referred to the entire subsection (f) of § 4106 or only to paragraphs (1)(B) and (2)— whether the sunset date caused the limitation on protests of civilian agency task or delivery orders to expire on May 27, 2011 or caused only the authorization of protests of orders valued in excess of $10 million and the GAO's exclusive jurisdiction over such protests to expire.

In November 2011, Wildflower filed this bid protest action challenging a civilian agency delivery order in the Court of Federal Claims, after having withdrawn its protest at GAO.  It is undisputed that Wildflower's protest is neither a protest of an order valued in excess of $10 million nor a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued.  After Wildflower filed this action in November 2011, the president on December 31, 2011 signed the National Defense Authorization Act for Fiscal Year 2012 ("2012 NDAA"), Pub. L. No. 112-81, 125 Stat. 1298 (2011).  The 2012 NDAA extended the sunset date in paragraph (3) of 41 U.S.C. § 4106(f) and amended the language of paragraph (3) so that it stated to which paragraphs the sunset date applied: "(3) EFFECTIVE PERIOD.—Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016."  2012 NDAA, § 813, 125 Stat. at 1491.  Whereas the sunset date in the 2008 NDAA applied to "this subsection," the paragraph containing the sunset date as amended by the 2012 NDAA referred only to the authorization of protests of orders valued in excess of $10 million and GAO's exclusive jurisdiction over such protests.

Based on the plain and unambiguous language of the 2008 NDAA, the limitation on protests of civilian agency task or delivery orders expired on May 27, 2011.  *See MORI Assocs.*, 102 Fed. Cl. at 536–37; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("[W]here the statutory language provides a clear answer, [the court's analysis] ends there . . . ."); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981))); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  In this case, relying on the plain and unambiguous language does not lead to an absurd result.  *See MORI Assocs.*, 102 Fed. Cl. at 539–40.  The legislative history of the 2008 NDAA does not embody an extraordinary showing of intentions contrary to the plain and unambiguous language of the statute.  *See Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395 (Fed. Cir. 1990) ("[T]he legislative history should usually be examined at least 'to determine whether there is a clearly expressed legislative intention contrary to the statutory language.'" (quoting *Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 629 (Fed. Cir. 1989))).

Defendant and Govplace ask the Court to depart from the plain and unambiguous language of the 2008 NDAA in light of statutes enacted subsequent to the 2008 NDAA and their legislative history—specifically, the 2012 NDAA and the 2012 NDAA's legislative history as well as the 2011 NDAA.  "The question of how much weight a court should accord to subsequent legislation and subsequent legislative history is one that has troubled many judges throughout the years."  *In re Conner Home Sales Corp.*, 190 B.R. 255, 259 (E.D.N.C. 1995). "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."  *United States v. Price*, 361 U.S. 304, 313 (1960).

The Federal Circuit has observed that "[t]here appears to be some confusion as to the role of later statutes in interpreting earlier ones."[4]  *Thompson v. Cherokee Nat. of Okla.*, 334 F.3d 1075, 1092 (Fed. Cir. 2003), *aff'd sub nom. Cherokee Nat. of Okla. v. Leavitt*, 543 U.S. 631 (2005).  The Federal Circuit has also explained "there appears to be general agreement that a later statute cannot be read as clarifying the meaning of an earlier statute where the earlier statute is unambiguous and the later statute is ambiguous."[5]  *Id.* at 1092.  The Supreme Court affirmed the Federal Circuit, specifically rejecting the use of a later statute to interpret earlier ones because the earlier statutes were not ambiguous.  *Cherokee Nat. of Okla.*, 543 U.S. at 646–47.

Here, as discussed *supra*, the plain and unambiguous language of the 2008 NDAA makes clear that the limitation on protests of civilian agency task or delivery orders expired on May 27, 2011.  The statutes enacted subsequent to the 2008 NDAA are ambiguous with respect to whether subsequent Congresses believed that the limitation on protests of civilian agency task or delivery orders expired on May 27, 2011.

In January 2011, before the enactment of the 2012 NDAA, Congress enacted two other statutes.

> In one, the provision relating to defense contracts was changed to sunset in 2016 the subparagraph authorizing task order protests exceeding $10 million, and the GAO's exclusive authority over them.  In the other, Congress expressly stated its recodification of title 41[, which included the limitation on protests of civilian agency task or delivery orders,] was intended to conform to the original intent of the enacting Congresses, with corrections to address ambiguities, and its only change to the FASA sunset was the housekeeping insertion of the actual date of passage.

*MORI Assocs.*, 102 Fed. Cl. at 541 (citations omitted).  These statutes are ambiguous—if not irrelevant—with respect to the issue whether the 111th Congress believed that the limitation on protests of civilian agency task or delivery orders expired on May 27, 2011.

---

[4] On one hand, the Supreme Court has indicated that later statutes play an extremely limited role, if any, in interpreting earlier statutes.  *See, e.g.*, *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77 n.6 (1994); *United States v. Sw. Cable Co.*, 392 U.S. 157, 170 (1968); *Price*, 361 U.S. at 313.  On the other hand, the Supreme Court has been receptive to the use of subsequent legislation to interpret an earlier enactment. *See, e.g.*, *Heckler v. Turner*, 470 U.S. 184, 211 (1985); *Bell v. New Jersey*, 461 U.S. 773, 784 (1983); *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980); *Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n.8 (1980); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380–81 (1969); *Tiger v. W. Inv. Co.*, 221 U.S. 286, 309 (1911).

[5] The Federal Circuit found that a later statute "was not unambiguously intended to clarify the meaning of the prior . . . acts" at issue.  *Thompson*, 334 F.3d at 1092.  Under those circumstances, the court held that the later statute "[could ]not work a supposed clarification of the earlier . . . acts."  *Id.*

With the 2012 NDAA, the 112th Congress amended paragraph (3) of § 4106(f), which relates to protests of *civilian* agency task and delivery orders, by inserting the following paragraph: "(3) EFFECTIVE PERIOD.—Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016."  The parties have proffered at least two ways that the 2012 NDAA's amendment to the paragraph containing the sunset date can be interpreted as it relates to the paragraph containing the sunset date in the 2008 NDAA.

One could conclude from the 2012 NDAA, as Wildflower does, that the 112th Congress believed that FASA's limitation on protests of civilian agency task or delivery orders expired in May 2011.  Stated differently, the perceived need to state to which paragraphs the 2012 NDAA sunset date applied shows that Congress understood that the sunset date in the 2008 NDAA caused the entire subsection (f) to expire, not only the provision authorizing protests of orders valued in excess of $10 million and GAO's exclusive jurisdiction over such protests.  Pl.'s Resp. to Def.'s & Intervenor's Mots. to Dismiss for Lack of Jurisdiction ("Pl.'s Supplemental Resp.") 8–9 (citing *Med Trends, Inc.*, 102 Fed. Cl. at 6) (docket entry 55, Feb. 15, 2012).

However, one could also argue, as defendant and Govplace do, that the 2012 NDAA shows the 112th Congress believed that the 2008 NDAA sunset date did not affect the entirety of subsection (f).  According to defendant and Govplace, the 2012 NDAA only addressed the authorization of protests of orders valued in excess of $10 million and GAO's exclusive jurisdiction over such protests.  Because the 2012 NDAA did not address the limitation on protests or the authority of the Court of Federal Claims to hear protests of task and delivery orders related to the scope, period, or maximum value of the underlying contract, Congress must have assumed that these two provisions remained in effect.  *See* Def.-Intervenor's Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("Def.-Intervenor's Supplemental Mot.") 4–5; Def.-Intervenor's Reply to Pl.'s Resp. to Def.-Intervenor's Mot. to Dismiss ("Def.-Intervenor's Supplemental Reply") 2–6 (docket entry 60, Feb. 27, 2012); Def.'s Mot. to Dismiss ("Def.'s Supplemental Mot.") 8; Def.'s Reply in Supp. of Its Mot. to Dismiss ("Def.'s Supplemental Reply") 6–8 (docket entry 67, Mar. 7, 2012); Mar. 14, 2012 Hr'g at 10:05:35.

As demonstrated by the parties' arguments above, the 2012 NDAA is ambiguous with regard to the scope of the sunset provision in the 2008 NDAA.  Because the language of the earlier statute is plain and unambiguous, this case does not present an occasion to depart from the plain meaning of the earlier statute based on subsequent enactments.  *See Thompson*, 334 F.3d at 1092.

With regard to subsequent legislative history, defendant and Govplace cite Senate and House reports on the 2012 NDAA to suggest that some members of the 112th Congress believed that the limitation on protests of civilian agency task or delivery orders did not expire on May 27, 2011.  *See* Def.'s Supplemental Mot. 8; Def.'s Supplemental Reply 12; Def.-Intervenor's Supplemental Mot. 4; Def.-Intervenor's Supplemental Reply 4, 8.  For example, defendant and Govplace cite a report by the House Committee on Armed Services that stated that the 2008 NDAA had "temporarily expanded the [GAO's] jurisdiction to hear bid protests by authorizing it to hear protests on task and delivery orders valued in excess of $10.0 million" and that "[t]he authority was provided with a sunset in 2011 in order to allow Congress to evaluate the

effectiveness of the expanded jurisdiction and gauge the impact of increased workload on GAO." H.R. Rep. No. 112-78, at 171–72 (2011); *see also* S. Rep. No. 112-16, at 3 (2011).

The Court is not persuaded that the legislative history of subsequent enactments sheds significant light on the meaning of the 2008 NDAA. *See, e.g.*, *MORI Assocs., Inc.*, 102 Fed. Cl. at 541 (finding that subsequent legislative history did not control the meaning of the 2008 NDAA). The language of the 2008 NDAA is clear. Additionally, subsequent legislative history is less weighty than subsequent statutes in interpreting the meaning of an earlier statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). Moreover, as the Supreme Court has stated, "[E]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Id.*

For these reasons, when Wildflower's action was filed in November 2011, the limitation on protests of civilian agency task or delivery orders did not bar Wildflower's bid protest action because the limitation had expired.

> **B.**     *The Restored Limitation on Protests of Civilian Agency Task or Delivery Orders Pursuant to the 2012 NDAA Does Not Divest this Court of Jurisdiction Over Wildflower's Bid Protest Action that Was Pending When the 2012 NDAA Was Enacted*

> 1.     <u>The Supreme Court Has Established a Framework for Analyzing Whether a Statute Is Retroactive</u>

Defendant and Govplace argue in the alternative that, even if the limitation had expired, the 2012 NDAA "resurrected" or "reinstated" the limitation on protests of civilian agency task or delivery orders. This limitation, defendant and Govplace argue, withdraws jurisdiction over actions, such as this one, that were pending when the 2012 NDAA was enacted. Def.'s Supplemental Mot. 8–9; Def.'s Supplemental Reply 13 n.4; Def.-Intervenor's Supplemental Mot. 5–7; Def.-Intervenor's Supplemental Reply 6–8. The parties agree that the relevant statutory language is "[a] protest is not authorized." 41 U.S.C. § 4106(f).

The Supreme Court has held that "a court is to apply the law in effect at the time it renders its decision." *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974). The Court has also held that "[r]etroactivity is not favored in the law" and that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."[6] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The Supreme Court has often stated that there exists a presumption against retroactivity. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").

---

[6] "Despite the dangers inherent in retroactive legislation, it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." *INS v. St. Cyr*, 533 U.S. 289, 316 (2001).

The Supreme Court has developed a two-step framework to analyze whether a statute is retroactive.[7] *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).  First, the court must assess "whether Congress has expressly prescribed the statute's proper reach." *Id.* (quoting *Landgraf*, 511 U.S. at 280) (internal quotation marks omitted).  If Congress has not provided an express statement in the statute regarding its reach, the court should "try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'"[8] *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)); *accord INS v. St. Cyr*, 533 U.S. 289, 316–17 (2001).

If the statute's temporal reach is not resolved at the first step, the court then turns to the second step of the retroactivity analysis.  At this step, the court seeks to determine "whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.'" *Fernandez-Vargas*, 548 U.S. at 37 (alterations in original) (quoting *Landgraf*, 511 U.S. at 278).

A statute does not operate retroactively simply "because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269 (citation omitted).  "Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70.  The determination that a statute operates retroactively "comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."[9] *Id.* at 270.

---

[7] "[P]recedent focuses upon private parties, and the analysis therefore only imperfectly applies to Congress's changes to governmental liability." *Lyons v. United States*, 99 Fed. Cl. 552, 556 (2011).

[8] For example, in *Hamdan v. Rumsfeld*, the Supreme Court found that a jurisdiction-ousting statute did not apply to pending actions given its analysis using normal rules of construction. 548 U.S. 557, 577–80 (2006), *superseded by statute on other grounds by* Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600.  The Supreme Court stated that the absence of a provision reserving jurisdiction over pending actions in a jurisdiction-ousting statute is not dispositive.  *Hamdan*, 548 U.S. at 578 n.7 (relying on, *inter alia*, *Bruner v. United States*, 343 U.S. 112 (1952)).

[9] Determining whether a statute operates retroactively "is not always a simple or mechanical task." *Landgraf*, 511 U.S. at 268.  "Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Id.* at 270.  "However, retroactivity is a matter on which judges tend to have 'sound . . . instinct[s],' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* (alteration in original) (citations omitted) (quoting *Danforth v. Groton Water Co.*, 59 N.E. 1033, 1034 (Mass. 1901)).

If the court determines that a statute has a retroactive effect at the second step, the presumption against retroactivity is triggered and the statute will not apply to events or transactions occurring before its enactment absent clear congressional intent to the contrary. *Id.* at 280; *see Rodriguez v. Peake*, 511 F.3d 1147, 1153 (Fed. Cir. 2008).

> 2.   Step One of the Retroactivity Analysis: The Language "A Protest Is Not Authorized" Sufficiently Evidences the Prospective Reach of the Restored Limitation on Protests of Civilian Agency Task or Delivery Orders

At the first step of the retroactivity analysis, the Court must determine whether Congress has expressly stated the statute's temporal reach. Here, the statute does not contain a specific statement that Congress desired the statute to apply retroactively. In fact, no party has contended that the 2012 NDAA expressly addresses the effect of § 4106(f) on pending actions. Because Congress has not provided an express statement, the Court must "try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'" *Fernandez-Vargas*, 548 U.S. at 37 (quoting *Lindh*, 521 U.S. at 326).

In applying the normal rules of statutory construction, one must first consider the meaning of the verb phrase, "is not authorized," which follows the subject, "a protest." 41 U.S.C. § 4106(f)(1). This formulation is in the passive voice, meaning that the subject is acted upon rather than acting. *See* The University of Chicago, Chicago Manual of Style para. 5.115 (16th ed. 2010) ("Voice shows whether the subject acts (active voice) or is acted on (passive voice) . . . .").[10] Accordingly, a protest is the thing not authorized.

*The Oxford English Dictionary* defines "authorize" as a verb meaning, *inter alia*, "[t]o give legal or formal warrant to (a person) *to do* something; to empower, permit authoritatively." The Compact Oxford English Dictionary 799 (2d ed. 1997). *Black's Law Dictionary* similarly defines the term as a verb meaning "[t]o give legal authority; to empower" and "[t]o formally approve; to sanction." Black's Law Dictionary 153 (9th ed. 2009). Accordingly, to say that something is *not* authorized means that the thing is not "empower[ed]," is not "permit[ed] authoritatively," is not "formally approved," and is not "sanctioned." Here, as noted, that thing is "a protest."

Conspicuously omitted from the statute's language is a phrase following "authorized" indicating what a protest is not authorized to do or have done to it (e.g., to be filed, to be maintained, to be brought), as *The Oxford English Dictionary* definition suggests. Accordingly, the Court must look elsewhere in the statute to determine what, specifically, is not authorized. On this point, the definition of "protest" itself is instructive.

"Protest" is used as a singular noun in paragraph (1) of § 4106(f)—"[a] protest is not authorized." 41 U.S.C. § 4106(f)(1). "Protest" is also used as a singular noun in the other paragraphs of the subsection. *See* 41 U.S.C. § 4106(f)(1)(A) (authorizing "a protest on the

---

[10] In this particular statute, the actor is never identified; there is no phrase indicating by whom a protest is not authorized. The sensible conclusion is that Congress, the author of the statute, does not authorize a protest.

ground that the order increases the scope, period, or maximum value of the contract under which the order is issued"); *id.*§ 4106(f)(1)(B) (authorizing "a protest of an order valued in excess of $10,000,000"); *id.* § 4106(f)(2) ("Notwithstanding section 3556 of title 31, the Comptroller General shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).").

The parties agree that "protest" is not defined for purposes of § 4106(f). If a statute does not define a term, the courts "give the phrase its ordinary meaning." *Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010). *Black's Law Dictionary* defines the noun protest as "[a] formal statement or action expressing dissent or disapproval." Black's Law Dictionary 1344 (9th ed. 2009). The Competition in Contracting Act ("CICA") similarly defines "protest" as "a written objection by an interested party." 31 U.S.C. § 3551(1); *see Technatomy Corp.*, B-405130, 2011 WL 2321836, at *4 (Comp. Gen. June 14, 2011) (employing CICA's definition of protest in GAO's analysis of § 4106(f)). When CICA's definition is adopted, the provision could be read as stating that "[a written objection by an interested party] is not authorized in connection with the issuance or proposed issuance of a task or delivery order." The provision could be read similarly if *Black's Law Dictionary*'s definition is relied upon.

Reading § 4106(f) as stating that "[a written objection by an interested party or a formal statement or action expressing dissent or disapproval] is not authorized" means that *a filing* by a party with GAO or the court is not authorized. If "a filing"—read as a noun—is not authorized, it is necessarily implied that the act of filing—read as the verb "to file"—is not authorized. *See Technatomy Corp.*, 2011 WL 2321836, at *4 ("[T]he prohibition of protests in the 2008 NDAA, which states that '[a] protest is not authorized,' can only be reasonably interpreted as meaning a protest may not be filed." (second alteration in original)).

Because § 4106(f) provides that a filing is not authorized, the statute sufficiently evidences its prospective reach and that it does not affect a court's jurisdiction over the action of a party, such as Wildflower, that filed its action before the subsequent statute took effect.[11] *See*

---

[11] *Cf. Salahuddin v. Mead*, 174 F.3d 271, 275 (2d Cir. 1999) ("[B]y limiting the exhaustion requirement to actions that 'shall be brought,' Congress has expressly precluded application of that requirement to actions that have already been filed."); *Craig v. Eberly*, 164 F.3d 490, 494 (10th Cir. 1998) ("The language 'may be brought' clearly indicates that [the statute] applies only to cases commenced after its enactment, not to those pending at the time."); *Gibbs v. Ryan*, 160 F.3d 160, 163 (3rd Cir. 1998) ("We believe that if Congress had intended [to apply the three-strikes provision of the Prison Litigation Reform Act to pending cases,] it would not have limited the 'three strikes' provision to an inmate's ability to 'bring' an action. Congress could have tied the 'three strikes' bar to an inmate's ability to *maintain* an action. It did not do so."); *Wright v. Morris*, 111 F.3d 414, 418 (6th Cir. 1997) ("[B]ecause [the statute] governs only the bringing of actions, it does not affect pending cases."); *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1025 (7th Cir. 1996) (interpreting the statutory language "[i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding" as only governing "bringing new actions or filing new appeals"); *White v. Gregory*, 87 F.3d 429, 430 (10th Cir. 1996) ("Our review of the Act leads us to conclude the amendments to 28 U.S.C. § 1915 do not apply when, as in this case, the prisoner/appellant filed his notice of appeal before April 26, 1996, the date President Clinton signed the Act into law.").

*Kevcon, Inc.*, B-406418, 2012 WL 759325, at \*3 (Comp. Gen. Mar. 7, 2012); *Standard Commc'ns, Inc.*, B-406021, 2012 WL 474550, at \*2 (Comp. Gen. Jan. 24, 2012).  Here, because Wildflower filed its action before the limitation on protests of civilian agency task or delivery orders was restored, the action is not affected by § 4106(f).  Accordingly, the Court finds that Congress's language was sufficiently clear to establish that the restored limitation was not intended to affect pending actions.[12]

In so holding, the Court rejects the arguments advanced by Govplace regarding the language of the restored limitation on protests of task or delivery orders.  Govplace argues that § 4106(f) indicates that *filing* and *maintaining* an objection are not authorized or that the "entire proceedings" are not authorized.  Def.-Intervenor's Supplemental Reply 7; Mar. 14, 2012 Hr'g at 10:07:17.  In so arguing, Govplace appears to overlook the distinction between filing and maintaining an action.  Although § 4106(f) clearly provides that filing an objection is not authorized, additional language would be needed to provide that *maintaining* a pending objection is not authorized.  *See, e.g.*, *Gibbs v. Ryan*, 160 F.3d 160, 163 (3rd Cir. 1998).  Moreover, neither CICA's nor *Black's Law Dictionary*'s definition of the noun "protest" embraces the all-encompassing "entire proceedings" interpretation advanced by Govplace.

### 3. Step Two of the Retroactivity Analysis: The Restored Limitation on Protests of Civilian Agency Task or Delivery Orders Does Not Divest this Court of Jurisdiction over Wildflower's Pending Action Because of the Presumption Against Retroactivity

Having analyzed the language of § 4106(f), the Court concluded that Congress intended that the provisions of § 4106(f) should apply prospectively, thus leaving pending actions, such as this one, unaffected.  However, even if Congress had not addressed the statute's temporal reach, the Court would conclude at the second step of the retroactivity analysis that § 4106(f) does not apply to Wildflower's pending action because of the presumption against retroactivity.

As noted, *see supra* Part II.B.1, at this step in the retroactivity analysis, the court must consider "whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.'"  *Fernandez-Vargas*, 548 U.S. at 37 (alterations in original) (quoting *Landgraf*, 511 U.S. at 278).  In *Princess Cruises, Inc. v. United States*, the Federal Circuit announced three factors based on the Supreme Court's *Landgraf* decision that the

---

[12] As discussed, *see infra* Part II.C, absent the limitation on protests of civilian agency task or delivery orders, this Court has general bid protest jurisdiction over protests of task or delivery orders.  Thus, the issue is whether the 2012 NDAA has withdrawn the court's jurisdiction over cases such as this one where the case was within the court's jurisdiction when filed.  The Court's conclusion that the language of the statute sufficiently indicates the prospective reach of the limitation on protests of task and delivery orders is buttressed by the principle that "withdrawal of Tucker Act jurisdiction by implication is disfavored, which means that a court must find that the statute at issue . . . reflects an unambiguous congressional in [sic] intent to displace the Tucker Act's waiver of sovereign immunity."  *Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007).

court must consider at the second step of the retroactivity analysis. 397 F.3d 1358, 1362–63 (Fed. Cir. 2005). Those factors are (1) "the nature and extent of the change of the law"; (2) "the degree of connection between the operation of the new rule and a relevant past event"; and (3) "familiar considerations of fair notice, reasonable reliance and settled expectations." *Id.* (quoting *Landgraf*, 511 U.S. at 270); *see, e.g.*, *Woodward v. Dep't of Justice*, 598 F.3d 1311, 1315 (Fed. Cir. 2010) (applying *Princess Cruises* factors); *Tarver v. Shinseki*, 557 F.3d 1371, 1375–77 (Fed. Cir. 2009) (same); *Rodriguez*, 511 F.3d at 1152–56 (same); *Lyons v. United States*, 99 Fed. Cl. 552, 558–60 (2011) (same).

> a.   *Princess Cruises* Factor One: The Nature and Extent of the Change
> in Law Weighs in Favor of Finding that the Restored Limitation on
> Protests of Civilian Agency Task or Delivery Orders Does Not
> Apply to Wildflower's Pending Action

Pursuant to the first *Princess Cruises* factor, the Court must consider the nature and extent of the change in law. With regard to the former, the Supreme Court has stated that a statute that is jurisdictional in nature—such as § 4106(f), *see supra* Part II.A—"usually" does not affect substantive rights. *Landgraf*, 511 U.S. at 274 ("Application of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" (quoting *Hallowell v. Commons*, 239 U.S. 506, 508 (1916))); *see also Hughes Aircraft Co.*, 520 U.S. at 951 ("The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity . . . ."). Thus, jurisdictional statutes "normally" apply to pending actions. *Landgraf*, 511 U.S. at 274.

However, there is *not* a presumption that jurisdictional statutes apply to pending actions. *Hamdan*, 548 U.S. at 576; *see Hughes Aircraft Co.*, 520 U.S. at 951. The Supreme Court has established that a statute may *both* be jurisdictional *and* affect substantive rights.[13] *See Hughes Aircraft Co.*, 520 U.S. at 951 (finding that a law created "jurisdiction where none previously existed" and "thus [spoke] not just to the power of a particular court but to the substantive rights of the parties," and explaining that "[s]uch a statute, even though phrased in 'jurisdictional' terms, is as much subject to [the] presumption against retroactivity as any other"); *LaFontant v. INS*, 135 F.3d 158, 163 (D.C. Cir. 1998) ("The Supreme Court has clearly established the principle that in determining retroactivity, jurisdictional statutes are to be evaluated in the same manner as any other statute.").

When a statute allocates jurisdiction to an administrative forum from a judicial forum, case law indicates that the statute is solely jurisdictional and does not affect the substantive rights of the parties. *See Hallowell*, 239 U.S. at 508; *LaFontant*, 135 F.3d at 162; *Hincapie-Nieto v. INS*, 92 F.3d 27, 29 (2d Cir. 1996); *Kolster v. INS*, 101 F.3d 785, 788 (1st Cir. 1996). Case law

---

[13] In *Hamdan*, the Supreme Court indicated that both jurisdiction-*creating* and jurisdiction-*ousting* statutes may be substantive as well as jurisdictional. 548 U.S. at 582 n.12 ("While the Court . . . [has] recognized that statutes 'creating' jurisdiction may have retroactive effect if they affect 'substantive' rights, we have applied the same analysis to statutes that have jurisdiction-stripping effect." (citations omitted) (relying on *Lindh*, 521 U.S. 320)).

also indicates that a statute eliminating the jurisdiction of all potential fora is substantive as well as jurisdictional.  *See Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 166 (3d Cir. 1998) (finding that an amendment did "not simply allocate jurisdiction among fora," but rather "'[destroyed] jurisdiction where [it] previously existed'" and "'thus [spoke] not just to the power of a particular court but to the substantive rights of the parties as well'" (second alteration in original) (quoting *Hughes Aircraft Co.,* 520 U.S. at 951)); *Bonner v. Home123 Corp.*, No. 2:05-CV-146 PS, 2006 WL 1518974, at *10 (N.D. Ind. 2006) (explaining that a statute had "an impermissible retroactive effect by extinguishing Plaintiffs' substantive right to have their day in court").[14]

Here, § 4106(f) limits protests of civilian agency task or delivery orders at GAO and in the courts.  FAR 16.505(a)(10) also limits protests of task or delivery orders at GAO or at an agency.  Thus, the only recourse for a would-be protestor of a task or delivery order valued at less than $10 million whose protest does not concern the scope of the underlying contract is to make a complaint to the contract ombudsman, who is tasked with ensuring that all contractors are afforded a fair opportunity to be considered for the task or delivery order.  *See* 41 U.S.C. § 4106(g); FAR 16.505(b)(6); *see also* AR Tab E, at 674 (FirstSource contract provision limiting delivery order protests pursuant to then-FAR 16.505(a)(9)); AR Tab E, at 677 (FirstSource contract provision setting forth ombudsman procedures pursuant to then-FAR 16.505(b)(5)). The Court does not view the ombudsman procedures for complaints as comparable to an administrative or judicial review of protests.  *See Weeks Marine, Inc. v. United States*, 79 Fed. Cl. 22, 24 n.2 (2007) ("The Court does not regard a[n agency] 'ombudsman' procedure included in the solicitation as a viable substitute for the judicial or administrative bid protest review that currently exists for sealed bidding." (citation omitted)), *rev'd in part on other grounds*, 575 F.3d 1352 (Fed. Cir. 2009).  Accordingly, the restored limitation on protests of civilian agency task or delivery orders is substantive as well as jurisdictional and effects a significant change in the law. Thus, the first *Princess Cruises* factor weighs in favor of finding that the restored limitation does not apply to Wildflower's pending action by reason of the presumption against retroactivity.

---

[14] For example, the U.S. District Court for the District of Columbia recently held:

> Unlike *LaFontant*, in which the petitioner was still permitted to seek relief in an agency proceeding, the statute in the instant case bars plaintiff from relief in *any* tribunal. . . .  As such, it is not merely a jurisdictional statute, but rather it also affects substantive entitlement to relief.  Accordingly, in the absence of an express provision to the contrary, the Court applies the general presumption against retroactivity.  *See LaFontant*, 135 F.3d at 162–163.

*Moses v. Dodaro*, 774 F. Supp. 2d 206, 211 (D.D.C. 2011).

        b.      *Princess Cruises* Factor Two: The Connection Between Operation of the New Rule and Relevant Past Events Weighs in Favor of Finding that the Restored Limitation on Protests of Civilian Agency Task or Delivery Orders Does Not Apply to Wildflower's Pending Action

Pursuant to the *Princess Cruises* framework, the Court next considers the connection between the operation of the new rule and a relevant past event. The Federal Circuit's analysis of this factor has focused on whether a party has relied to its detriment on the prior law. *E.g.*, *Rodriguez*, 511 F.3d at 1155.

Here, when Wildflower submitted its bid and when it filed its bid protest, the limitation on protests of civilian agency task or delivery orders was no longer in existence, and, as later discussed, *see infra* Part II.C, Wildflower was entitled to file a protest of a delivery order in this court. Wildflower was not aware that, a few months later, its only recourse would be to file a complaint with the ombudsman. These facts show a significant connection between operation of the new rule (a limitation on protests of civilian agency task or delivery orders) and the relevant past events (submission of a bid and filing of a bid protest action).[15] Thus, the second factor in *Princess Cruises* also weighs in favor of concluding that the restored limitation on protests of civilian agency task or delivery orders does not apply to Wildflower's pending action because of the presumption against retroactivity.

        c.      *Princess Cruises* Factor Three: Fair Notice, Reasonable Reliance, and Settled Expectations Weigh in Favor of Finding that the Restored Limitation on Protests of Civilian Agency Task or Delivery Orders Does Not Apply to Wildflower's Pending Action

Finally, the Court must consider whether the new law offends notions of fair notice, reasonable reliance, and settled expectations. The Federal Circuit has not decided how much weight to afford this third factor because in the cases in which the *Princess Cruises* framework has been applied, the other two factors pointed in the same direction as the third factor. *E.g.*, *Princess Cruises, Inc.*, 397 F.3d at 1366.

Here, Wildflower submitted its bid after the limitation on protests of task or delivery orders had expired. Wildflower filed its bid protest after the Court of Federal Claims and GAO held that the limitation had expired. The president signed the 2012 NDAA a few months *after* Wildflower submitted its bid and filed its bid protest action in this court. Under these circumstances, the Court concludes that Wildflower's reliance on the previous law was objectively reasonable, Wildflower had settled expectations, and Wildflower was without fair

---

[15] Wildflower both submitted its bid to the agency *and* filed its bid protest action in this court *after* the limitation on protests had expired and *before* the 2012 NDAA sought to restore the limitation. Because the issue is not before the Court, the Court does not address the effect that the limitation on protests of task or delivery orders would have had on this case had Wildflower either submitted its bid to the agency *before* the limitation expired on May 27, 2011 or filed its bid protest action with the court *after* the 2012 NDAA was enacted on December 31, 2011.

notice that the law would change.  Thus, the third *Princess Cruises* factor weighs in favor of not applying the restored limitation on protests of civilian agency task or delivery orders to Wildflower's pending action because of the presumption against retroactivity.

Accordingly, even if the language of the provision limiting protests of civilian agency task or delivery orders did not sufficiently evidence the temporal reach of the limitation, all three *Princess Cruises* factors indicate that applying the restored limitation would be retroactive in the disfavored sense, and thus the presumption against retroactivity would apply.  Accordingly, the restored limitation on protests of civilian agency task or delivery orders would not operate to divest this court of jurisdiction over Wildflower's action that was pending when the 2012 NDAA was enacted.

> C.   *Absent FASA, the Tucker Act as Amended by the Administrative Dispute Resolution Act Confers Jurisdiction on the Court to Hear Protests of Task or Delivery Orders*

Having found that 41 U.S.C. § 4106(f) does not affect the Court's jurisdiction over Wildflower's pending action, the Court must determine whether, in the absence of FASA, its general bid protest jurisdiction confers jurisdiction over protests of task or delivery orders.  The Tucker Act as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA") provides, in part, that the Court of Federal Claims has the authority

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

Defendant argues that FASA is the sole source of the court's jurisdiction over task or delivery order protests and that, when the limitation did not exist from May through December 2011, this Court had no jurisdiction over task or delivery order protests because "when the jurisdiction of a cause depends upon a statute[,] the repeal of the statute takes away the jurisdiction."  Def.'s Supplemental Reply 13 (alteration in original) (quoting *Ins. Co. v. Ritchie*, 72 U.S. 541, 544 (1866)) (internal quotation marks omitted); *see Ex parte McCardle*, 74 U.S. 506, 514 (1868).

However, defendant overlooks the fact that two years after the enactment of FASA's limitation on task or delivery order protests, Congress passed the ADRA which conferred jurisdiction on the Court of Federal Claims to hear a broad range of bid protests.  Pub. L. No. 104-320, § 12, 100 Stat. 3870, 3874–76 (1996).  When confronted with the coexistence of these two statutes, the court in *A & D Fire Protection, Inc.* explained that the broad bid protest jurisdiction contained in the ADRA did not repeal FASA's limitation on task or delivery order protests.  72 Fed. Cl. at 134.  Rather, the two existed concurrently—the Tucker Act as amended by the ADRA conferring jurisdiction to hear bid protests and FASA limiting the court's jurisdiction to hear task or delivery order protests.  *See id.*  The court "[understood] that [the]

ADRA expanded this court's bid protest jurisdiction but left intact the bar against a specific type of bid protest." *Id.*

Accordingly, as originally passed, FASA deprived the Court of Federal Claims of jurisdiction over task or delivery order protests, except as they related to an order that increased the scope, period, or value of the underlying contract. *See* FASA, § 1054, 108 Stat. at 3264. After FASA's passage, the Tucker Act was amended and the court's bid protest jurisdiction was expanded. The limitation on hearing task or delivery order protests, however, remained in place and co-existed with the new, broader jurisdiction of the court. *See A & D Fire Prot., Inc.*, 72 Fed. Cl. at 134. Thus, FASA had, and continues to have, a limiting effect on the court's broader jurisdiction under the Tucker Act as amended by the ADRA. Phrased another way, FASA effectively displaces the government's waiver of sovereign immunity contained in 28 U.S.C. § 1491. *See Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007). Therefore, the Court finds that, absent the FASA limitation, task or delivery order protests fall within the court's broader bid-protest jurisdiction. *See MORI Assocs., Inc.*, 102 Fed. Cl. at 540 ("The government does not argue that it would be absurd for [the court's] general bid protest jurisdiction to extend over task order protests, and the Court agrees with the *MED Trends* opinion's conclusion that this 'would not be an absurd result.'" (quoting *MED Trends, Inc.*, 102 Fed. Cl. at 6)); *MED Trends, Inc.*, 102 Fed. Cl. at 6 (finding jurisdiction over a task order protest filed in June 2011 and noting that "a default to the court's general jurisdiction over bid protests under 28 U.S.C. § 1491(b)(1) [in the absence of the FASA limitation] would not be an absurd result"); *A & D Fire Prot., Inc.*, 72 Fed. Cl. at 134. Accordingly, in the absence of FASA, Wildflower's delivery order protest would fall within the court's general bid protest jurisdiction.

> D.      The Court Has Jurisdiction Pursuant to the Tucker Act as Amended by the ADRA
>         to Hear Challenges to Corrective Actions

Pursuant to the Tucker Act, as amended by the ADRA, this court has exercised jurisdiction to hear bid protests in three circumstances:

> (1) a pre-award protest, which is an objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . of a contract"; (2) a post-award protest, which objects to "the award of a contract"; or (3) a protest objecting to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

*Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 527 (2010) (alteration in original) (citations omitted) (quoting 28 U.S.C. § 1491(b)(1)).

To support its motion to dismiss Wildflower's claims for lack of jurisdiction, defendant argues that Wildflower's claims do not fall within any of the categories of actions that can be brought in this court. Def.'s Mot. 32. Specifically, defendant argues that Wildflower does not challenge the solicitation, a proposed award, or a final award, nor does it allege a violation of statute or regulation in connection with a procurement. *Id.*

This court has held that corrective action is part of an agency's procurement process and, thus, a protest of a corrective action falls within this court's bid protest jurisdiction as an

objection to a solicitation. *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 705–06 (2011); *see Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 315 (2010) ("[W]here a plaintiff, as the contract awardee, files a protest challenging an agency's decision to resolicit a proposal, the plaintiff's protest 'is in the nature of a pre-award claim.'" (quoting *IMS Servs., Inc. v. United States*, 32 Fed. Cl. 388, 398 (1994))). As has been previously determined, "the jurisdictional grant in 28 U.S.C. § 1491(b)(1) applies to the entire procurement process." *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 703. And the Federal Circuit has broadly interpreted "procurement" to encompass the period from the agency's determination that it requires contracted goods or services through final contract award and completion. *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2009) (adopting the definition of procurement in title 41 and stating that "'procurement' includes all stages of the process of acquiring property or services, *beginning with the process for determining a need* for property or services and ending with contract completion and closeout." (quoting 41 U.S.C. § 403(2) (2006), which was recodified at 41 U.S.C. § 111 by Pub. L. No. 111-350, § 3, 124 Stat. 3477, 3681 (2011)) (internal quotation marks omitted)).

Accordingly, this court possesses broad bid protest jurisdiction that encompasses a protest of corrective action executed during the course of a procurement. *See Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 703 ("[T]he body of decisional law addressing challenges to a procuring agency's corrective action reflect[s] that the bid protest jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491(b)(1) should be broadly construed."); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 148–49, 151 (2010) (finding that the court had jurisdiction pursuant to 28 U.S.C. § 1491(b)(1) when the plaintiff challenged "the agency's corrective action of resoliciting revised proposals" after the agency had awarded the contract to the plaintiff); *Ceres Gulf, Inc.*, 94 Fed. Cl. at 316 (finding jurisdiction over a pre-award bid protest that challenged the agency's corrective action and noting that "this Court and the Federal Circuit have ruled that jurisdiction exists to review an agency's corrective action decision").

Moreover, in order for this court to have jurisdiction, Wildflower does not have to challenge the *terms* of a solicitation as defendant argues; rather, Wildflower's challenge to the corrective action taken during the course of a procurement is sufficient to bring its claims within the court's bid protest jurisdiction. *See Ceres Gulf*, 94 Fed. Cl. at 316 (noting that the plaintiff "need not challenge precise terms in the amended solicitation in order for this Court to have pre-award bid protest jurisdiction" and that the agency's "decision to reopen the procurement itself provides the Court with the jurisdiction necessary to review [the plaintiff's] claims").

Because Wildflower's challenge to CBP's corrective action falls within the court's pre-award bid protest jurisdiction, Wildflower need not assert an additional challenge to an award or proposed award, neither of which currently exists, nor must it allege a violation of a statute or regulation relating to the procurement in order to avail itself of this Court's jurisdiction.[16]

---

[16] With regard to the category of actions concerning violations of statute or regulation, Wildflower argues that, "[s]ince Wildflower's complaint alleged that CBP failed to treat Wildflower fairly, Wildflower has sufficiently alleged a violation of a regulation in connection with a procurement." Pl.'s Resp. to Def.'s & Intervenor's Mots. to Dismiss & Mots. for J. on Administrative R. 16 n.8 (discussing the directives contained in FAR 1.102-2(c)(1) and (c)(3))

*Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 173, 175 (2011) ("Several Court of Federal Claims cases reject the proposition that allegation of specific statutory or regulatory violations is necessary for the court to have jurisdiction over solicitations, proposed awards or awards . . . .").

In addition to its contention that Wildflower's claims are not within this court's bid protest jurisdiction, defendant states that Wildflower is presenting "a [Contract Disputes Act ("CDA")] claim disguised as a bid protest." Def.'s Combined Br. in Resp. to Pl.'s Mot. for J. Upon Administrative R. & in Reply in Supp. of Def.'s Mot. to Dismiss, or in Alternative, for J. Upon Administrative R. ("Def.'s Resp.") 5 (docket entry 46, Jan. 18, 2012). Defendant and Govplace assert that this Court must dismiss Wildflower's claims for lack of jurisdiction because Wildflower has not completed the procedures required before it may bring a CDA claim in this court.

The Tucker Act states that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, *including a dispute concerning termination of a contract.*" 28 U.S.C. § 1491(a)(2) (emphasis added). Section 7104(b)(1) of title 41 is the codification of section 10 of the CDA, Pub. L. No. 95-563, § 10, 92 Stat. 2383, 2388 (1978). *See* Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3820 (2011).

"When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; the [CDA] was not designed to serve as an alternative administrative remedy, available at the contractor's option." *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995). In order to bring an action pursuant to the CDA in this court, plaintiff must first submit a written claim to the contracting officer. 41 U.S.C. § 7103(a); *see also Diversified Maint. Sys., Inc. v. United States*, No. 11-504 C, 2012 WL 542536, at *7 (Fed. Cl. Feb. 21, 2012) ("Before filing suit in this court under the CDA, a plaintiff must first submit a written claim to the contracting officer for a final decision." (citing 41 U.S.C. § 7103(a))).

Defendant is correct that a challenge to a contract termination is properly brought pursuant to the CDA. *See Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 71 (2006) (noting that a challenge to a contract termination claim "may only be brought under the CDA"); *Davis/HRGM Joint Venture v. United States*, 50 Fed. Cl. 539, 544 (2001) (holding that this court's bid protest jurisdiction does not encompass "claims involv[ing] a dispute arising out of the contract between the parties" and finding that a challenge to a termination for convenience "does not relate to an interested party's objection to a solicitation, a proposed award, or an award" pursuant to § 1491(b)(1)); *see also* 41 U.S.C. § 7102(a) (explaining that, in relevant part, the CDA "applies to any express or implied contract . . . made by an executive agency for (1) the procurement of property, other than real property in being; [and] (2) the procurement of services."). Accordingly, if Wildflower were only challenging the agency's decision to

---

(docket entry 47, Jan. 18, 2012). Because the Court has jurisdiction over Wildflower's claims pursuant to its pre-award bid protest jurisdiction, the Court need not address whether it has jurisdiction by reason of an alleged violation of statute or regulation. *See Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 706 ("[A]n allegation [of a violation of statute or regulation] is unnecessary, however, when a complaint . . . falls within the first prong of section 1491(b)(1).").

terminate its contract for convenience, then Wildflower would have to do so pursuant to this court's CDA jurisdiction and would, therefore, be statutorily required to submit a claim to the contracting officer before filing suit in this court.

However, Wildflower asserts claims challenging CBP's corrective action implemented during the course of a procurement, and corrective action taken during the course of procurement falls within the court's bid protest jurisdiction, as discussed *supra* Part II.D.  That a contract termination is involved in an agency's corrective action conducted during the course of a procurement, as is the case here, "does not divest the court of its bid protest jurisdiction." *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 705.  As a result, the Court has jurisdiction over Wildflower's bid protest claims pursuant to 28 U.S.C. § 1491(b)(1).

Accordingly, the Court **DENIES** defendant's and Govplace's motions to dismiss Wildflower's claims for lack of jurisdiction.

## III.   Standing and Ripeness

### A.   *Wildflower Has Standing*

"[S]tanding under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  A showing of "direct economic interest" requires the plaintiff to demonstrate that "any alleged errors caused prejudice." *Weeks Marine, Inc.*, 575 F.3d at 1359.  To show prejudice, a pre-award protestor must show "a 'non-trivial competitive injury which can be addressed by judicial relief.'" *Id.* at 1361 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)); *accord ICP Nw., LLC v. United States*, 98 Fed. Cl. 29, 36 (2011) ("Applying these standards, the Federal Circuit and this court have required pre-award bid protestors, in cases such as this one, to demonstrate that the solicitation would prejudice them by imposing a significant competitive disadvantage.").

Here, Wildflower is indisputably an actual bidder.  As the former awardee protesting corrective action, Wildflower has shown a "direct economic interest" that would be affected by the award of the contract or failure to award the contract. *See Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 708 ("[I]n almost every decision in which the standing of a contract awardee to protest a procuring agency's corrective action was addressed, the court has concluded that the protester had standing."); *Jacobs Tech.*, 100 Fed. Cl. at 178; *Sheridan*, 95 Fed. Cl. at 149; *The Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 504 (2007); *Delaney Constr. Corp. v. United States*, 56 Fed. Cl. 470, 474 (2003); *cf. Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 152–53 (2011) (finding the plaintiff was not an interested party and therefore lacked standing because the plaintiff was the awardee and the contract was not being resolicited). Accordingly, the Court **DENIES** defendant's motion to dismiss for lack of standing.

### B.   *Wildflower's Claims Are Ripe*

The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A two-part test determines whether a claim is ripe for judicial action: (1) "whether the issues are fit for judicial decision—that is, whether there is a present case or controversy between the parties" and (2) "whether there is sufficient risk of suffering immediate hardship to warrant prompt adjudication—that is, whether withholding judicial decision would work undue hardship on the parties." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1580–81 (Fed. Cir. 1993). The first part of the test requires that the "agency action is final." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1362 (Fed. Cir. 2008).

Here, defendant argues that "the agency's pending solicitation is not a final decision because it does not mark the consummation of the agency's decision making process." Def.'s Mot. 33. Defendant also argues that Wildflower's harm is contingent upon future events that may not occur, i.e., Wildflower may receive the award again. *Id.* at 35. Nonetheless, the fact that CBP has terminated Wildflower's contract and issued a second solicitation makes this case ripe for judicial action. *See, e.g.*, *Sheridan Corp.*, 95 Fed. Cl. at 150; *The Centech Group, Inc.*, 78 Fed. Cl. at 505.

Accordingly, the Court **DENIES** defendant's motion to dismiss for lack of ripeness.

## IV.    Merits

Wildflower initiated this action on November 3, 2011 challenging the termination for convenience of its delivery order and the reissuance of the RFQ with a revised SOW. Wildflower has filed a motion for judgment on the administrative record pursuant to RCFC 52.1. Both defendant and Govplace filed motions for judgment on the administrative record pursuant to RCFC 52.1.

In a bid protest action, the court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4); *see* 5 U.S.C. § 706(2)(A); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The protestor will succeed when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)) (internal quotation marks omitted). To succeed on the first ground, the protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion"; to succeed on the second ground, the protestor must show that there was a "clear and prejudicial violation of applicable statutes or regulations." *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332–33) (internal quotation marks omitted).

Here, Wildflower makes two broad arguments. First, Wildflower contends that the contracting officer's decision to implement corrective action was unreasonable, arbitrary, capricious, and an abuse of discretion. Second, Wildflower argues that the scope of the corrective action—to terminate the contract award to Wildflower, revise the RFQ, and resolicit bids—was arbitrary, capricious, and an abuse of discretion.

A. *The Contracting Officer's Decision to Implement Corrective Action Was Reasonable*

A contracting agency has broad discretion whether to pursue corrective action during the course of a procurement. *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 716 ("As with all procurement decisions, an agency has broad discretion to take necessary corrective action."); *Jacobs Tech.*, 100 Fed. Cl. at 190 ("Contracting officers are entitled to broad discretion in the procurement process, including in their decisions to take corrective action." (citation omitted)). When reviewing an agency's decision to take corrective action, the Court must assess whether the decision was "rational, reasonable, and coherent and reflect[ed] due consideration of all relevant factors." *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 716. The contracting agency does not have to "admit an error" prior to its decision to pursue corrective action. *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 72 (2001).

Here, CBP decided to take corrective action after receiving a letter from Govplace in which Govplace requested that CBP hold the award and "review the requirements and lowest priced technical solution that was submitted" because Govplace perceived that an error occurred in the solicitation process with regard to whether the equipment had to be immediately compliant with the 802.1ae standard. AR Tab B, at 371–73; *see* AR Tab B, at 394–95. CBP's decision to take corrective action was premised on its conclusion that "the solicitation was not clear on when an offeror had to be fully 802.1ae compliant." AR Tab B, at 395.

The main issue in the dispute over whether CBP's decision to implement corrective action was reasonable is whether or not it was rational for the agency to conclude that the RFQ, including the SOW and other related materials, was ambiguous. If that conclusion was not rational, then CBP acted unreasonably when it decided to implement the corrective action. However, if CBP rationally perceived an ambiguity in the solicitation with respect to when proposals had to meet the standards set forth in the SOW, then it was reasonable for CBP to craft corrective action to clarify the ambiguity in order to afford a fair opportunity to all bidders.

A term in a solicitation is ambiguous when it is "open to more than one reasonable interpretation." *CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 666, 674 (2011) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996)); *accord Banknote Corp. of Am., Inc.*, 365 F.3d at 1353 ("The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation.").

Wildflower points out that the RFQ states that the awardee would have 550 days (about 18 months) for "delivery." AR Tab B, at 68–69. Presumably, delivery includes full performance and total compliance with the requirements of the SOW. Given this, it was reasonable for an offeror to believe that it would be proposing a technically acceptable bid if its proposed software came into compliance and could be properly installed within the performance period.

Defendant notes that the FirstSource contract, under which this procurement was initiated, provided that hardware and software components must be "ready for immediate use . . . unless otherwise specified in individual delivery orders." Def.'s Resp. 28 (citing AR Tab E, at 658) (internal quotation marks omitted). It does not appear that any of the materials in the procurement at issue contained an explicit provision indicating that anything other than

immediate compliance was acceptable.  Therefore, the FirstSource contract language and the fact
that there was no explicit provision regarding the timing of full compliance in the solicitation
suggest that immediate compliance was mandatory to receive award.  However, that conclusion
is at variance with the implication created by the eighteen-month performance period.

Wildflower next notes that the SOW and the RFQ both contain "or equal" language,
meaning that the required equipment could be the equipment specified in the SOW or its
equivalent.  *See, e.g.*, AR Tab B, at 68, 106.  All parties understood that the brand to which the
"or equal" equipment would be compared was Cisco, and it apparently was common knowledge
that only Cisco equipment was immediately compliant with the 802.1ae standard set forth in the
SOW.  Therefore, if Cisco equipment was immediately compliant with the SOW standards, and
the RFQ and SOW stated that proposed non-Cisco equipment must be equal to its brand-name
equivalent, it would be reasonable for an offeror to conclude that "or equal" equipment should,
too, be immediately compliant.  However, because Cisco was understood to be the *only* brand
that could immediately comply with the specifications, there was, in effect, no "or equal" brand.
This interpretation would effectively render the "or equal" language meaningless, implying that
it was acceptable to provide 802.1ae compliant equipment sometime during the eighteen-month
performance period.

Wildflower explained this reasoning in a question it posed to CBP while the bidding
process was underway.  *See* AR Tab B, at 150.  It requested clarification of whether software that
was not immediately compliant with the 802.1ae standard would be acceptable if it became
compliant within the eighteen-month performance period.  *Id.*  By limiting acceptable software
to that which was equal to Cisco, Wildflower explained that CBP was effectively "creating a sole
source procurement."  *Id.*  In response, CBP stated that other brands offered equipment that
would soon become compatible with the 802.1ae standard, specifically noting the Juniper brand.
AR Tab B, at 546.  CBP's answer suggested that brands that did not immediately meet the
standard could still be technically acceptable for purposes of the procurement if it was known
that the brand would later be able to meet the standard.  However, only Wildflower was privy to
this information since CBP provided its answer directly to Wildflower and did not post it on
FedBid for the other offerors to view and consider.  *See* AR Tab B, at 57.

Wildflower argues that its question and CBP's corresponding answer were, in fact,
available to the other offerors.  *See* Pl.'s Resp. to Def.'s FedBid Ex. Provided at Oral Arg. &
Provision of Citations Relating to Alleged Funding Excuse ("Pl.'s Supplemental Br.") 1–3
(docket entry 56, Feb. 15, 2012).  In support of this argument, Wildflower points to the FedBid
Buy Activity Report, which displays the question at issue along with a number of other questions
and their corresponding answers that were handled by CBP between August 31, 2011 and
September 2, 2011.  *Id.* at 2 (citing AR Tab B, at 147–48).  Wildflower argues that, from the face
of this document, it is evident that CBP answered and posted Wildflower's question and its
corresponding answer.  *Id.*  Accordingly, Wildflower reasons the other offerors were able to
view the exchange.

In response, defendant argues that the Buy Activity Report is "a 'buyer's report'
evidencing the buyer's direct communications" and is available only to the buyer, not to any
sellers involved in the procurement.  Def.'s Reply to Pl.'s Feb. 15, 2012 Supplemental Post-Hr'g
Br. ("Def.'s Supplemental Br.") 2 (docket entry 59, Feb. 27, 2012).  In support of this

explanation, defendant submitted documents from the FedBid website as an exhibit during the January 27, 2012 oral argument. *See* Def.'s Ex. 1. One document included a list of frequently asked questions as they relate to sellers involved in a procurement conducted through FedBid. *See id.* Defendant highlighted the answer to the following question: "What if [the seller has] a question or comment regarding a Buy?" *Id.* at 4. The highlighted portion of the answer explained how to submit a question to the buyer, here CBP, through the FedBid website. *Id.* It then explained that "[a]nswers not requiring reposting may be answered offline through email by the appropriate responder (i.e. . . . the Buyer, if the question or comment is related to the solicitation)." *Id.*

To further clarify, defendant draws the Court's attention to a video posted on the FedBid website. *See id.* at 5. This video explains to the buyer how sellers may submit questions and how the buyer then can manage its answers to those questions. The video states: "*All* questions and answers will be documented in the Buy Activity Report." *Id.* at 5; *Answering Buy Spec Questions*, FedBid, http://www.fedbid.com/buyers/videos/answering-buy-specification-questions/ (last visited Mar. 8, 2012) [hereinafter *FedBid Video*] (emphasis added). "All" implies that any question and answer addressed by the buyer will appear on the Buy Activity Report without regard to whether that question and answer were posted for other offerors to view. This is supported by the fact that the buyer is able to designate "no reply" as a response to a question received, a designation which appears on the Buy Activity Report so that the Buyer may manage its responses to sellers' questions. *FedBid Video*. Furthermore, the video explains that questions answered via FedBid would generate an e-mail to the seller. *Id.* Nothing in the video or defendant's exhibit suggests that this Buy Activity Report is available to any entity other than the buyer. Based on this evidence, defendant argues that, although the Buy Activity Report displayed a record of the questions submitted to and subsequently answered by the buyer, this report was not available to the offerors.

Other evidence in the record supports defendant's explanation. The contracting officer stated that no questions were posted for offerors to view after August 30, 2011. AR Tab B, at 57. He further stated that "questions and answers (19) up to [August 30, 2011] were posted as an attachment to the RFQ on FedBid for all potential offerors to review." *Id.* This is confirmed by the Buy Activity Report, which shows that the solicitation was reposted on August 30, 2011. AR Tab B, at 147. Defendant's exhibit explains that "[i]f the Buyer determines that an amendment to the solicitation is required, the Buyer will repost the Buy." Def.'s Ex. 1, at 4. Here, it is clear that CBP decided to post all questions and answers addressed from the opening date of the procurement through August 30, 2011 as an attachment to the RFQ, which required CBP to repost the solicitation, or "Buy." No other such reposting was made and the next entry on the chronological list of activity is the date the period to submit bids expired, as is evidenced by the term "Cancelled" appearing on September 6, 2011.

Accordingly, the weight of the evidence demonstrates, and the Court finds, that the Buy Activity Report was not available to any offerors during the course of the procurement and Wildflower's August 31, 2011 question and the corresponding answer were not disclosed to the other offerors at any point during the procurement process.[17] Therefore, the Court concludes that

---

[17] Nothing in the record suggests that Wildflower's August 31, 2011 question and its answer were attached to or disclosed during the second solicitation. The contracting officer explained

no offeror was privy to CBP's answer to Wildflower's question regarding the timing of 802.1ae compliance except for Wildflower through the e-mail it received in response to its inquiry.

Given the information generally available to all the offerors, it was reasonable for an offeror to understand that the equipment had to be immediately compliant with the 802.1ae standard, and it was also reasonable for an offeror to understand that equipment could become compliant during the eighteen-month performance period.

Furthermore, although Wildflower is correct when it argues that silence does not necessarily translate to ambiguity, *see Wanless v. Shinseki*, 618 F.3d 1333, 1337 (Fed. Cir. 2010) (explaining that "silence alone does not create an ambiguity" in the context of statutory interpretation); *Thomas v. Nicholson*, 423 F.3d 1279, 1284 n.5 (Fed. Cir. 2005) (noting, in the context of statutory interpretation, that "silence alone does not infer an ambiguity"), the solicitation was not merely silent.  The RFQ, SOW, and FirstSource contract contained information regarding when full performance had to be achieved and what type of equipment was required, but those sources of information, even taken together, did not provide an adequate explanation as to when fully compliant equipment had to be available.

Accordingly, the Court finds that there are at least two reasonable interpretations of the information the offerors had when preparing their initial bids—that the equipment had to be immediately compliant with the 802.1ae functionality standard at the time of the award and that the equipment could come into compliance with that standard sometime during the performance period.  This amounts to an ambiguity.[18]  Defendant argues that CBP was obligated to rectify this defect because it had to "provide each contractor 'a fair opportunity to be considered for all delivery orders'" pursuant to FAR 16.505(b) and sections G.5(a) and G.9 of the FirstSource contract.  Def.'s Resp. 20–21 (citing AR Tab E, at 672, 674).  Given CBP's regulatory and contractual obligations, it acted reasonably and within its discretion when it concluded that the

_____

that the questions attached to the original solicitation on August 30, 2011 were reattached to the second solicitation with edits made to the answer to one particular question in order to clarify the timing of 802.1ae compliance.  AR Tab B, at 60.  The record shows that the questions attached to the second solicitation (RFQ 20066877) were identical to those attached to the first (RFQ 20064082), except for alterations made to the answer dealing with the required time of 802.1ae compliance.  *Compare* AR Tab B, at 634–38 (questions attached to second RFQ), *with* AR Tab B, at 541–44 (questions attached to initial RFQ).

[18] Wildflower argues that Govplace was not prejudiced by the ambiguity in the solicitation.  As discussed, in its review of an agency's decision to take corrective action, the Court must assess whether the agency's decision was "rational, reasonable, and coherent and reflect[ed] due consideration of all relevant factors."  *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 716. Accordingly, whether Govplace was specifically prejudiced by the ambiguity is not dispositive. Here, the record makes clear, and the Court finds, that the agency considered "all relevant factors" and, as a result of such consideration, rationally sought to cure a reasonably perceived defect in the initial solicitation—namely the ambiguity surrounding the timing of 802.1ae compliance.

initial solicitation was ambiguous and that corrective action was required in order to give all offerors a fair opportunity to bid.

> B.      The Corrective Action Implemented by CBP Was Reasonable

Once it is established that an agency's decision to undertake corrective action is reasonable, the Court must determine whether the corrective action itself was "reasonable under the circumstances." *Sheridan Corp.*, 95 Fed. Cl. at 151 (quoting *DGS Contract Serv., Inc. v. United States,* 43 Fed. Cl. 227, 238 (1999)). Corrective action is reasonable when it is "rationally related to the defect to be corrected." *Id.* (citing *MCII Generator & Elec. v. United States*, No. 1:02-CV-00085-LMB, 2002 WL 32126244, at *1 (Fed. Cl. Mar. 18, 2002)). "Furthermore, the reason for the corrective action must be supported by the evidence in the record." *Id.* (citing *MCII Generator & Elec.*, 2002 WL 32126244, at *1).

Here, the corrective action implemented by CBP involved two interconnected steps: first, CBP terminated for convenience the delivery order that had been awarded to Wildflower, and, second, CBP revised the solicitation and reopened the bidding process, giving offerors twenty-four hours to submit their proposals in response to the revised solicitation. The Court must now determine whether the corrective action itself was rational in light of the circumstances surrounding the procurement and whether the corrective action was rationally related to the defect, namely the ambiguity with regard to the timing of 802.1ae compliance.

In support of its argument that the corrective action was unreasonable, Wildflower contends that (1) the revision to the RFQ did not address the ambiguity because there was no such ambiguity; (2) the revision to the RFQ was immaterial because it "simply put in writing what offerors already knew" and because Govplace did not make any technical changes to its proposal, Pl.'s Resp. 31–33; and (3) CBP's decision to give the offerors only twenty-four hours in which to submit new bids is evidence that the corrective action was not rationally related to clarifying the ambiguity. Pl.'s Mot. 28; Pl.'s Resp. 2, 36–37.

> 1.      The Initial RFQ Was Ambiguous

Wildflower's argument that the RFQ was not ambiguous with respect to when the equipment had to be 802.1ae compliant has been addressed above, *see supra* Part IV.A, and found to be unpersuasive. The Court has concluded that Wildflower's argument that the corrective action was not related to the defect in the solicitation because the solicitation was not ambiguous fails.

> 2.      The Amendments to the Language of the Initial RFQ Corrected the Ambiguity in the Solicitation, and It Is Irrelevant that Govplace's Response to the Second RFQ Made No Technical Changes

Wildflower's argument that the RFQ merely "put in writing what offerors already knew" is not persuasive. The Court has found that the solicitation was ambiguous as to when the equipment had to be 802.1ae compliant. That Wildflower and two other offerors may have proposed equipment that was not immediately compliant with the requisite standard does not mean that the solicitation was not open to more than one reasonable interpretation, i.e., that it

was not ambiguous.  Therefore, because CBP reasonably determined that the solicitation was
ambiguous and, thus, did not afford all offerors a fair bidding opportunity, the alteration of the
RFQ's language to correct that ambiguity was material to the procurement and properly
corrected the ambiguity.

Additionally, although Wildflower correctly points out that Govplace did not make any
technical changes to its proposal during the resolicitation, this Court must analyze the
reasonableness of an agency's corrective action based on the circumstances as they existed at the
time the agency crafted the corrective action.  Therefore, that Govplace did not alter its technical
proposal is irrelevant to the question whether CBP's corrective action was reasonable or
rationally related to clarifying the ambiguity in the original solicitation.

> 3.    CBP's Decision to Permit Twenty-Four Hours to Submit Bids Responsive
>        to the Second RFQ Was Reasonable Under the Circumstances

Wildflower argues that the twenty-four hour period offerors were given to bid during the
second solicitation was unreasonable.  Wildflower states, "CBP's corrective action cannot be
rational since it was not structured to remedy the very flaw that supposedly justified the
corrective action in the first place."  Pl.'s Resp. 37.  Wildflower argues that the twenty-four hour
resolicitation period proves the arbitrariness of CBP's corrective action.  *Id.*

To better address this argument, at the January 27, 2012 oral argument, the Court
inquired into the reasons for the twenty-four hour rebidding period and asked the parties to
discuss the ombudsman's remarks regarding the need to proceed quickly with the resolicitation.
*See* AR Tab B, at 390 (containing statements of the ombudsman that "this is no-year money,"
"[t]ime is of the essence," and "[w]e are poised to cancel and repost but not without getting the
funded [procurement request] back in our box today").

Defendant and Govplace explained that funding, or the potential lack thereof, was a
reason for the twenty-four hour period for rebidding.  *See* Def.-Intervenor's Reply to Pl.'s Resp.
to Def.'s FedBid Ex. Provided at Oral Arg. & Provision of Citations Related to the Alleged
Funding Excuse ("Def.-Intervenor's Supplemental Br.") 3 (docket entry 61, Feb. 27, 2012);
Def.'s Supplemental Br. 3–5.  Defendant states that CBP expected that the Fiscal Year ("FY")
2012 budget would reflect the same uncertainty as the FY 2011 budget and the agency was not
certain which of its "funds could be subject to rescission."  Def.'s Supplemental Br. 4.  The fear
of rescission of funds, particularly unobligated funds, defendant argues, was the reason CBP
acted quickly with respect to rebidding after the award to Wildflower was terminated.  *See id.*
Because of this background, defendant argues that the ombudsman's statement that "[t]ime is of
the essence" and other remarks regarding time sensitivity related to funding concerns.  *Id.* at 5.

Wildflower argues that funding was not an issue.  Wildflower interprets the
ombudsman's statements, *see* AR Tab B, at 390, as being triggered by "a threat of a protest by
Govplace."  Pl.'s Supplemental Br. 4.  Wildflower asserts that the ombudsman's statement that
the procurement was funded by "no-year money" showed that "there was no time pressure
regarding the award of this procurement caused by a threatened loss of funding."  *Id.* at 6.

Although the Court finds the position of defendant and Govplace more persuasive, it is not necessary to finally resolve the agency's motive.  Given the information CBP had when crafting the corrective action and the nature of the revisions made, *see* AR Tab B, at 59–60, the Court finds that the twenty-four hour resolicitation period was reasonable.  Nothing in the record suggests that a twenty-four hour period was insufficient to cure the ambiguity in the solicitation, and none of the offerors objected when they were informed of the amount of time the second solicitation would be open.[19]  Accordingly, the Court finds that the twenty-four hour period in which to resubmit bids responsive to the amended RFQ was reasonable under the circumstances.

The corrective action CBP crafted and implemented was reasonable, and CBP did not abuse its discretion or act arbitrarily, capriciously, or otherwise not in accordance with law when it executed the corrective action.

C.    *CBP Was Required by FAR to Disclose to the Other Offerors Wildflower's Winning Low Bid in Response to the Initial RFQ*

Wildflower argues that it was prejudiced by the fact that CBP disclosed the price of the contract that Wildflower was awarded to the other offerors before implementing the corrective action.  Wildflower contends that, by disclosing Wildflower's price to the other offerors and then resoliciting bids, the agency was essentially inviting the other offerors to underbid Wildflower.  *See* Pl.'s Mot. 32–34.  According to Wildflower, this action created "extreme competitive prejudice," *id*. at 33, "ensured that Wildflower would stand no chance of receiving the contract," *id*. at 34, and "undermined the fairness and integrity of the procurement."  *Id.*  As a result, Wildflower maintains that CBP's corrective action was "arbitrary and an abuse of discretion."  *Id*. at 33.

As an initial matter, Wildflower concedes that its price was properly disclosed to the other offerors once Wildflower was awarded the contract.  According to FAR Part 15, "[w]ithin 3 days after the date of contract award, the contracting officer shall provide written notification to each offeror whose proposal was in the competitive range but was not selected for award."  FAR 15.503(b)(1); *see also Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 721 n.23 ("The government is required to disclose the price of an awarded contract to the unsuccessful offerors." (referencing FAR 15.503 and FAR 15.506)).  By posting the name of the successful offeror and the price of its winning bid, CBP properly followed FAR directives, a fact Wildflower conceded at both oral arguments.  Jan. 27, 2012 Hr'g at 10:01:00; Mar. 14, 2012 Hr'g at 10:37:52 ("The release of Wildflower's pricing information was absolutely by the book.").

Moreover, the publicly available "Seller Frequently Asked Questions" posted on the FedBid website explained that "[o]nce a Buy has closed, and the Buyer has chosen a Selected Seller, all participating bidders may view the Selected Seller's total bid price and the Selected

---

[19] According to the contracting officer, all offerors were told via a 4:39 p.m. e-mail on September 20, 2011 that the solicitation would be reposted.  AR Tab B, at 59.  This was nearly one day before the solicitation was actually reposted on FedBid.  Thus, all four offerors knew before the RFQ was reposted that they would be required to submit new proposals within a twenty-four hour period.  *See* Mar. 14, 2012 Hr'g at 11:36:45.

Seller's identity." Def.'s Ex. 1, at 1. Therefore, all offerors should have been aware that, by virtue of the standard procedures of the FedBid website, when bidding closed and an awardee was selected, that awardee and its winning price would be disclosed.[20]

The Court recognizes that the disclosure of a winning bid prior to resolicitation could confer a competitive advantage on other offerors during a resolicitation in a lowest-price, technically acceptable procurement. However, in this case, because CBP's disclosure of Wildflower's price information was lawful and the offerors knew or should have known that the price of the winning bid would be revealed, and because the corrective action was reasonably calculated to cure the defect in the solicitation, it was proper for CBP to implement the corrective action despite the fact that other offerors knew Wildflower's winning price. *See Phenix Research Prods.*, B-292184.2, 2003 WL 21956013, at *5 (Comp. Gen. Aug. 8, 2003) ("[T]he prior disclosure of [product and price] information in a vendor's quotation does not preclude resolicitation where . . . the resolicitation is undertaken to correct perceived flaws in the original solicitation process.").

Wildflower argues that the Court of Federal Claims has in other cases found that the release of an offeror's winning price proposal prior to resolicitation was prejudicial to that offeror. Pl.'s Mot. 33 n.20 (citing *DGS Contract Serv. Inc.*, 43 Fed. Cl. at 238). However, the court in *DGS Contract Service* held that it was appropriate in that case for the contracting officer to disclose price information to all offerors because one unsuccessful offeror had received price information during debriefing. *DGS Contract Serv.*, 43 Fed. Cl. at 238. If the price information had not been revealed to all offerors, the offeror that had been debriefed would have been the only offeror privy to that information and would have therefore enjoyed a unique competitive advantage.

Here, the winning bid was lawfully disclosed to all unsuccessful offerors, rather than just to one. Moreover, the fact that the *DGS Contract Service* court found that it was appropriate for the agency to provide all offerors with price information in an effort to reduce competitive advantages during the reopened solicitation process, *id.*, supports the Court's conclusion that the disclosure of Wildflower's price prior to the resolicitation was not improper. Accordingly, Wildflower's argument related to disclosure of its winning price is unpersuasive.

D.      *Wildflower Conceded that CBP Acted in Good Faith*

Wildflower's counsel stated at the initial status conference that Wildflower was alleging that CBP acted in bad faith when it implemented corrective action. Hr'g at 11:29:49, *Wildflower v. United States*, 11-734 C (Fed. Cl. Nov. 7, 2011). Wildflower also alleged bad faith in its complaint and argued bad faith in its briefs. *See, e.g.*, Compl. ¶ 58 (contending that amending

---

[20] Wildflower also argues that it was "disparately" treated because the agency "did not release the prices of the other offerors to Wildflower, so Wildflower was the only offeror during the second round without the benefit of another offeror's price." Pl.'s Mot. 32 n.16. The Court is not persuaded by this argument because, even had the agency released the prices of each offeror, in a lowest-price, technically acceptable, reverse auction procurement, Wildflower's winning price would remain the most significant item of information.

the RFQ and reposting it was a "spurious excuse to justify giving GovPlace another opportunity to beat Wildflower's price"); Pl.'s Mot. 36.  However, Wildflower's counsel abandoned any claim of bad faith at the hearing on March 14, 2012.  In addition to stating that Wildflower was no longer alleging bad faith, Wildflower's counsel stated that the record demonstrates that government personnel "were acting in quite good faith."[21]  Mar. 14, 2012 Hr'g at 10:36:48.

## CONCLUSION

For the foregoing reasons, Wildflower's motion for judgment on the administrative record pursuant to RCFC 52.1 is **DENIED**; defendant's motion to dismiss based on lack of jurisdiction, standing, and ripeness pursuant to RCFC 12(b)(1) and Govplace's motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1) are **DENIED**; and the motions of defendant and Govplace for judgment on the administrative record pursuant to RCFC 52.1 are **GRANTED**. The Clerk shall enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on November 9, 2011 (docket entry 15).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **ORDERS** that the parties shall file, by **Monday, June 4, 2012**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**

  s/ George W. Miller
GEORGE W. MILLER
Judge

---

[21] Govplace argues that when an agency's decision to resolicit bids is made in "good faith," then the court should not disturb that determination.  Def.-Intervenor's Mot. to Dismiss, for J. on Administrative R., & in Opp'n to Req. for Permanent Inj. 14 (citing *Ceres Gulf*, 94 Fed. Cl. at 318).  The Court declines to adopt this formulation because "[a]n agency acting in good faith may still violate th[e] standard" set forth in 5 U.S.C. § 706(2)(A).  *Sys. Application & Techs., Inc.*, 100 Fed. Cl. at 716 n.21.